GLACIER STATE DISTRIBUTION SERVICES, INC., Plaintiff-
Appellant,

v.

WISCONSIN DEPARTMENT OF TRANSPORTATION and Wisconsin Department of Administration, Defendants-
Respondents.

Court of Appeals

*No. 97–2472. Submitted on briefs June 9, 1998.—Decided
August 6, 1998.*

(Also reported in 585 N.W.2d 652.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Richard A. Westley* and *David J. Regele* of *Westley & Regele, S.C.*, of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Kathleen M. Ptacek,* assistant attorney general.

Before Eich, Vergeront and Roggensack, JJ.

EICH, J. Glacier State Distribution Services, Inc., appeals from a summary judgment dismissing its action challenging the Department of Transportation's inclusion of a "stockpiling" requirement into its bid specifications for the state's purchase of road salt. Glacier argues that the requirement—which requires 100% of the salt to be in place in Wisconsin, or at specified locations on the state's borders, by the end of the calendar year—is arbitrary and unreasonable, unnecessarily limits competition, and violates the

Commerce Clause of the United States Constitution. We reject its arguments and affirm the judgment.

The facts are undisputed. Until recent years, the Wisconsin road salt market had been dominated by water-based suppliers sending their products to the state by either lake boats or barges. Limited by freezing waterways during the winter months, these suppliers would stockpile all of their salt in storage facilities at Wisconsin ports on the Mississippi River or Lake Michigan, and then deliver the salt by truck to storage sheds in various parts of the state.

The Department of Administration is the general purchasing agent for all executive state agencies in the State of Wisconsin, and, pursuant to § 16.71 STATS.,[1] has delegated to the Department of Transportation the authority to purchase road salt for the de-icing of state highways. The department purchases road salt not only for its own purposes but also on behalf of several counties and municipalities that choose to purchase their salt under the state's contract. The department requests bids for the salt and awards the contract to the lowest bidder, taking into consideration several factors, including the bidder's compliance with the contract specifications.[2] *See* § 16.75(1), STATS.[3]

---

[1] The statute reads in pertinent part:

**16.71 Purchasing; powers (1)** Except as authorized in s. 16.74, the [Department of Administration] shall purchase and may delegate to special designated agents the authority to purchase all necessary materials, supplies, equipment, all other permanent personal property and miscellaneous capital, and contractual services and all other expense of consumable nature for all agencies . . . .

[2] Typically, the department requests bids twice a year—once in the fall for the "seasonal fill" and again in the winter for the "supplemental fill." Glacier does not challenge the

Glacier is a Wisconsin corporation whose principal business is the transportation and sale of road salt. Glacier transports its salt by rail to various transloading points in Wisconsin, where it is unloaded and delivered to its final destination. Unlike many of its water-based competitors that, out of necessity, must move all their salt into Wisconsin before the onset of winter, Glacier is able to continue transporting its salt into the state throughout the year.

In its bid specifications for the 1995–96 road salt contract, the department added the following condition:

> Fifty (50) percent of the awarded Seasonal (guaranteed) tons must be delivered as requested or stockpiled in Wisconsin or at 1) Winona, MN; 2) Minneapolis, MN; 3) Saint Paul, MN; 4) Duluth, MN; 5) Dubuque, IA; 6) East Dubuque, IL by November 30, 1995. The remaining fifty (50) percent of the awarded Seasonal (guaranteed) tons must be delivered or stockpiled as above by December 31, 1995.

bid specifications for the supplemental fill, only for the seasonal fill.

[3] The statute reads in pertinent part:

**16.75 Buy on low bid, exceptions. (1)** (a) 1. All orders awarded or contracts made by the department for all materials, supplies, equipment and contractual services to be provided to any agency . . . shall be awarded to the lowest responsible bidder, taking into consideration life cycle cost estimates . . . , the location of the agency, the quantities of the articles to be supplied, their conformity with the specifications, and the purposes for which they are required and the date of delivery.

. . .

3. Bids may be received only in accordance with such specifications as are adopted by the department as provided in this subsection. Any or all bids may be rejected . . . .

In an addendum, the department agreed to consider storage facilities within 25 miles of Wisconsin's border, and any alternative proposals put forth by bidders.

Glacier objected to the stockpiling requirement, maintaining that "compl[iance] with this unrealistic provision would render [it] and other rail based suppliers non-competitive in the bidding process," because, unlike its water-based competitors, which already own or have access to stockpile facilities, Glacier would be forced to invest capital to either construct or acquire such facilities. After the department rejected its protest to the provision, Glacier pursued a statutory administrative appeal to the Department of Administration, which was also denied. It then sought judicial review of the denial.

When the stockpiling requirement appeared in the department's 1996–97 bid specifications, Glacier renewed its objections. When its administrative appeal was again denied, Glacier amended the complaint in the pending circuit court action to include review of this denial as well. As indicated, the court dismissed the action.

## I. Standard of Review

The parties do not dispute that, under § 16.75, STATS., the department has discretion to adopt bid specifications and award purchasing contracts. They differ, however, as to the proper standard under which we review the exercise of that discretion.[4] The department contends that its actions and decisions should stand unless we find an "abuse of discretion amounting to

---

[4] In appeals from decisions and orders of administrative agencies, we review the agency's decision, not the circuit court's. *Sterlingworth Condominium Ass'n v. DNR*, 205 Wis. 2d 710, 720, 556 N.W.2d 791, 794 (Ct. App. 1996).

fraud" in the manner in which it formulated the bid specifications, while Glacier argues that, to succeed on its appeal, it need only show that the department acted in an "arbitrary or unreasonable" manner.

The department's argument is grounded on *State ex rel. Hron Bros., Inc. v. Port Washington*, 265 Wis. 507, 62 N.W.2d 1 (1953), and *Automatic Merchandising Corp. v. Nusbaum*, 60 Wis. 2d 362, 210 N.W.2d 745 (1973). In *Hron Bros.*, the plaintiff appealed a city council's decision to award a construction bid to a contractor who was not the lowest bidder on the project. The trial court dismissed the action and the supreme court affirmed, holding that the grant of authority to the city to let the contract to the lowest responsible bidder "implies the exercise of discretion which will not be interfered with by the courts" except for "an abuse equivalent to fraud." *Hron*, 265 Wis. at 510, 62 N.W.2d at 2. Similar language appears in *Automatic Merchandising*. In that case, the plaintiff challenged the Department of Administration's exercise of discretion in awarding a purchase-of-supplies contract to a vendor who was not the lowest bidder. The trial court dismissed the plaintiff's complaint and the supreme court affirmed, stating that under the provisions of § 16.75, STATS., by authorizing the department to advertise and weigh alternative bids,[5] "an area of discretion is created with the manner in which discretion is exercised to be challenged only by a claim of flagrant abuse of discretion amounting to fraud." *Automatic*

---

[5] "Alternative bidding" is a process in which the advertisement for bids permits submission of bids on alternative kinds or qualities of work or materials. In *Automatic Merchandising*, for example, the "alternatives" were either new or used vending machines. *See Automatic Merchandising Corp. v. Nusbaum*, 60 Wis. 2d 362, 366–67, 210 N.W.2d 745, 747–48 (1973).

*Merchandising*, 60 Wis. 2d at 370, 210 N.W.2d at 749–50.

Glacier argues that, in a more recent case, *Aqua-Tech, Inc. v. Como Lake Protection & Rehabilitation District*, 71 Wis. 2d 541, 239 N.W.2d 25 (1976), the supreme court articulated a new rule: a lesser "arbitrary and unreasonable" standard for review of public-works bidding practices and procedures.

In *Aqua-Tech*, an unsuccessful low bidder sued to enjoin the award of a feasibility-study contract and appealed the trial court's denial of its request for a temporary injunction. The trial court's decision was grounded on its conclusion that the contract was not subject to statutory bidding requirements. The supreme court, believing that application of the bidding statutes to the project was an open question, reversed and remanded to the trial court, directing it to grant the temporary injunction and proceed to consider the case on its merits—including whether the district either failed to follow applicable statutes, or "abused its discretion" in awarding the contract. *Id.* at 554, 239 N.W.2d at 31. And while no question arose on the appeal as to the applicable standard of review of a bidding authority's exercise of discretion, the court, in an apparent attempt to guide the trial court on remand, discussed the role of the judiciary in such cases. Noting a "reluctance . . . to interfere with the discretion . . . vested in a public bidding authority," the court went on to state that because the process is so intertwined with the public interest, judicial review should be available in appropriate cases. *Id.* at 550, 239 N.W.2d at 29–30. Then, discussing the nature of such review, the court looked to general principles put forth by commentators and in decisions of courts in other jurisdictions, and concluded that "[such] review is gen-

erally limited to determining whether the bidding authority acted in an arbitrary or unreasonable manner . . . ." *Id.* at 550–51, 239 N.W.2d at 30.[6]

Thus, while not expressly overruling the "abuse amounting to fraud" language of the earlier cases, the *Aqua-Tech* court took care to discuss and delineate the proper standard for reviewing a bidding authority's exercise of discretion—concluding, as indicated, that the authority's action would be overturned if it was "arbitrary or unreasonable." We see that as a binding, precedential decision. *See State v. Kruse*, 101 Wis. 2d 387, 392, 305 N.W.2d 85, 88 (1981) (when the supreme court "intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision") (quoted source omitted). *Aqua-Tech* appears to be just such a case.[7]

---

[6] The court also quoted as follows from 10 McQuillin, Municipal Corporations § 29.73, at 425–26 (3d ed.): "The determination of the question of who is the lowest responsible bidder does not rest in the exercise of an arbitrary and unlimited discretion, but upon a bona fide judgment, based upon facts tending to support the determination." *See also* 10 Eugene McQuillin, The Law of Municipal Corporations § 29.73.05, at 504 (3rd ed. 1990) (quoted source omitted).

[7] Arguing for an opposite result, the department states in its brief that *Hron* was cited with approval in *Aqua-Tech*. It is true that *Hron* is cited in the *Aqua-Tech* opinion, but only for two briefly stated and very general propositions—neither of which undercuts our analysis of the case: (1) that "statutes conferring a power to let contracts to the lowest responsible bidder imply the exercise of discretion"; and (2) that the court's reluctance to interfere with a bidding authority's exercise of discretion is based on the "principle that statutory bid requirements are intended for the benefit and protection of the public

We noted this apparent inconsistency between *Aqua-Tech* and the earlier cases in *Power Systems Analysis, Inc. v. City of Bloomer*, 197 Wis. 2d 817, 541 N.W.2d 214 (Ct. App. 1995). However, because there was no claim in *Power Systems* that the bidding authority had misused its discretion, we declined to address the conflict, simply noting its existence and stating that its resolution would be left to "the future." *Id*. at 824–25 n.5, 541 N.W.2d at 216–17.

The future, it appears, has now arrived; and resolution of any doubt regarding the applicable standard for reviewing decisions of public bidding authorities is made easy by the long-standing rule that, where decisions of the supreme court appear to be inconsistent, or in conflict, "we follow the court's most recent pronouncement." *Krawczyk v. Bank of Sun Prairie*, 203 Wis. 2d 556, 567, 553 N.W.2d 299, 303 (Ct. App. 1996). We conclude, therefore, that, under *Aqua-Tech*, the proper standard for reviewing the department's exercise of discretion in promulgating the stockpiling requirement is whether its decision to do so was "arbitrary or unreasonable."[8]

and not of the individual bidder." *Aqua-Tech*, 71 Wis. 2d 541, 549–50, 239 N.W.2d 25, 29 (1976). Indeed, as we indicated above, the *Aqua-Tech* court went on to emphasize that, despite that well-considered reluctance, courts may intervene in appropriate cases—and it went on to set forth the "arbitrary and unreasonable" standard for determining when such intervention is warranted. *Id*. at 550–51, 239 N.W.2d at 30.

[8] We are also satisfied of the appropriateness of such a standard. As the supreme court said in *Aqua-Tech*, "Statutory bidding requirements are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business, as well as to insure that the public receives the best

## II. Application of the Standard

Glacier argues that the stockpiling requirement is both arbitrary and unreasonable on its face because: (1) it is not the result of a rational decisionmaking process; (2) it does nothing to further the department's goal of ensuring the availability of road salt; and (3) applying it to rail-based suppliers, which are unaffected by the winter freeze, makes no sense.

An arbitrary action or decision is "one that is either so unreasonable as to be without a rational

work or supplies at the most reasonable price practicable." *Id.* at 550, 239 N.W.2d at 30. We agree with the *Aqua-Tech* court that "[i]t would be inconsistent with these objectives to deny all means of judicial review" of bidding decisions. *Id.*

We also believe that setting the judicial-review standards so high as to require affirmance in all cases but those involving "fraud" on the part of the bidding authority is inconsistent with the public-policy goals underlying regulation of the public-works bidding process. Public contract laws are designed for the benefit and protection of the public, and among those benefits is the fostering of competition, which lowers the cost to the public. If bidding authorities could freely accept or reject bids for whatever reason—however arbitrary or unreasonable—and be insulated in doing so except in the rare situation where their conduct could be said to be so "flagrant" as to amount to "fraud," an appearance of favoritism could well emanate that could discourage bidders' participation in the process, resulting in fewer bids and higher prices. At worst, such a standard could encourage preferential treatment in the awarding of bids. An "arbitrary or unreasonable" standard, on the other hand, fosters a more balanced atmosphere, where courts, while still paying considerable deference to the authority's exercise of discretion in administering the bidding process, would still retain the ability to ensure that the public is protected from unreasonable, capricious or biased actions.

basis, or one that is the result of an unconsidered, willful or irrational choice of conduct—a decision that has abandoned the 'sifting and winnowing' process so essential to reasoned and reasonable decisionmaking." *Nelson Bros. Furniture Corp. v. Department of Revenue*, 152 Wis. 2d 746, 757, 449 N.W.2d 328, 332 (Ct. App. 1989). Generally, we have equated the term "unreasonable" with irrational or lacking "a rational basis." *See School Dist. of Waukesha v. SDBAB*, 201 Wis. 2d 109, 116, 548 N.W.2d 122, 126 (Ct. App. 1996).

 Seizing on the "sifting and winnowing" language of cases such as *Nelson Bros.*, Glacier's first complaint is that the stockpiling requirement was promulgated by the department without a hearing and with little or no discussion or consideration, but was adopted only after a bidders' conference, at which a single bidder—who already met the requirement—suggested that it be included in the bidding specifications. The department correctly points out, however, that § 16.75, STATS., does not require it to hold a hearing or follow any other specified procedure in adopting bid specifications or letting bids. Nor does it appear that the department's decision to include the stockpiling requirement—even if, as Glacier asserts, it was a "last-minute" action—was in any way arbitrary, unreasonable or irrational. The record reveals that the requirement grew out of the department's belief that stockpiling would promote the goal of providing safe and convenient transportation on Wisconsin highways in winter by ensuring timely delivery of salt. The department was aware of problems in this regard in other states, and it had substantial time to consider and reconsider the requirement before issuing the 1996–97 bid specifications. We note in this regard that Glacier's continued

protests during this period were more than adequate to put the department on notice of Glacier's position with respect to its adoption.

Glacier next argues that the stockpiling requirement does nothing to further the goal of ensuring the availability of salt because, for land-based shipments, there is no relation between the requirement and either the distance involved or the ultimate delivery to the end-user. Glacier also asserts that shortages in the past have been the result of the state's failure to contract for enough salt, not from any lack of stockpiling. The argument is misplaced, for even if Glacier's assertions were true, we do not consider it either unreasonable or arbitrary for the department to require nearby stockpiling of salt in order to ensure its availability for use as and when needed—regardless of whether it is shipped to Wisconsin by land or water. According to the department, the reason for the stockpiling requirement is to ensure that 100% of the needed seasonal salt is in Wisconsin by the end of the calendar year. And, as it stated in answers to Glacier's interrogatories, its needs in this regard are related not "to the means of transportation into the state" but to the "safety of the state's citizens," which the department says "depends on the availability of salt for winter maintenance purposes." The department stated that it was simply "unwilling to accept the risk that salt will not be available when needed." Glacier has not persuaded us that moving the salt over greater distances if necessary renders the stockpiling requirement either arbitrary or unreasonable, as those terms are defined in the cases.

Glacier also claims that subjecting it and other rail-based suppliers to the stockpiling requirement is unreasonable because, unlike water-based suppliers,

they are able to continue transporting and delivering salt throughout the winter months and thus have no need to stockpile. Here, too, Glacier has not persuaded us that the stockpiling requirement is either arbitrary or unreasonable in this regard. While freezing waterways do not restrain rail-based suppliers, other factors could affect delivery, such as supplier strikes, interruptions in transportation, road or weather conditions, or unexpected demands for salt in other areas of the country. The stockpiling requirement is, at a minimum, a reasonable means of ensuring that the salt purchased will be available when needed, no matter what form of transportation the supplier uses.

## III. Limitations on Competition

Glacier also argues that the stockpiling requirement "unnecessarily limits competition," in violation of the Wisconsin Administrative Code § ADM 7.03(1)(c),[9] because it favors water-based suppliers over rail-based suppliers. Glacier repeats its assertions that water-based suppliers already engage in stockpiling out of necessity, while it and other rail-based suppliers—who have never needed to stockpile their salt or maintain intermediate storage facilities—now must invest capital to either acquire or construct them.

---

[9] WISCONSIN ADM. CODE § ADM 7.03 states in part:

Adm. 7.03 Specifications

(1) SPECIFICATION REQUIREMENTS

All requests for bids, to the extent possible, shall contain specifications which define the product and the time for performance. Specifications shall include all of the following:

. . .

(c) Performance criteria that do not unnecessarily limit competition, but that do clearly define the need to be filled.

Again, we are not persuaded. First, the requirement applies to all suppliers, whether water- or rail-based. The fact that Glacier and other rail-based suppliers who do not already own or have access to intermediate storage facilities may be at some disadvantage does not mean that the requirement is either unreasonable, impracticable or impossible to follow. Second, we agree with the department that Glacier is free to compete for contracts with any of the municipalities currently participating in the state contract, and to seek contracts with nonparticipating municipalities. As the department points out, if the state decided that it wanted V–8 engines in its police cars, such a requirement would work to the detriment of a company producing only four-cylinder cars, just as the statutory requirement preferring recycled over newly manufactured goods, § 16.72(2)(e), STATS., works to the disadvantage of companies that do not produce goods made from recycled or recovered materials. The department adopted the bid specification for the safety of Wisconsin citizens, and while the requirement might have a slight effect on competition, it is not an impermissible limitation.

## IV. The Commerce Clause

Finally, Glacier argues that the stockpiling requirement violates the Commerce Clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3, which grants Congress the power to regulate commerce among the states. While the clause does not expressly limit the states' regulatory powers, its "negative" or "dormant" aspect prohibits state and local governments from protecting local economic interests by curtailing the movement of articles of commerce into or

out of the state. *J.F. Shea Co., Inc. v. City of Chicago*, 992 F.2d 745, 747 (7th Cir. 1993).

There is, however, a well-recognized exception to that principle: When the state is acting as a "market participant," rather than as a market regulator, it is not subject to the restraints of the Commerce Clause.[10] "Nothing in the purposes animating the Commerce Clause forbids a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976).

Glacier argues that the exception is inapplicable because, in this instance, the department is acting not as a market participant but as a market regulator. Citing *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82 (1984), Glacier claims that the department is using its economic leverage in an attempt to influence the salt transportation and distribution market. In *South-Central*, the Supreme Court held that the Alaska Department of Natural Resources was not acting as a "market participant" when it required purchasers of state timber to partially process the timber in Alaska prior to export, because the requirement imposed a condition on the market "downstream" of the timber sale transaction. Glacier says that this case is similar because "the in-state stockpile requirement precedes payment, precedes purchase, precedes delivery, and . . . precedes the passing of title. . ., [and thus] represents an attempt by the [department] to control transactions upstream from

---

[10] *See, e.g., White v. Massachusetts Council Constr. Employers, Inc.*, 460 U.S. 204, 208 (1983); *Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976); *J.F. Shea Co., Inc. v. City of Chicago*, 992 F.2d 745, 747 (7th Cir. 1993).

the purchase transaction"—the same evil present in *South-Central*.

■

Again, we disagree. The department is not attempting to control any transactions other than the one in which it is involved: the purchase of road salt for state and municipal use. It is not employing its regulatory powers to dictate who may, or may not, buy or sell road salt in Wisconsin; nor is it requiring that Glacier, or any other businesses, do anything other than have the purchased salt in specified locations at a specified time—hardly an unusual or oppressive provision in a purchase contract. And, as we have said, Glacier is free to contract with other municipalities and counties on its own terms. The department is simply a party to a contract for the purchase of road salt and, when acting as a proprietor, a government shares the same freedom from the Commerce Clause that private parties enjoy. *Reeves, Inc. v. State*, 447 U.S. 429, 439 (1980). *See also White v. Massachusetts Council Constr. Employers, Inc.*, 460 U.S. 204, 210 (1983) (only where the agency acts as a regulator does the question arise whether its actions burden interstate commerce in violation of the Commerce Clause). It is thus free to set specifications which must be met if a vendor wishes to bid for the state's purchasing contract, and, as a market participant, it may do so free from the restraints of the Commerce Clause.

*By the Court.*—Judgment affirmed.