# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP802 |

| | |
|---|---|
| COMPLETE TITLE: | Andrew Waity, Judy Ferwerda, Michael Jones and Sara Bringman, <br><br>      Plaintiffs-Respondents, <br><br>   v. <br><br> Devin Lemahieu, in his official capacity and Robin Vos, in his official capacity, <br><br>      Defendants-Appellants-Petitioners. |

ON PETITION TO BYPASS THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | January 27, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 1, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Stephen E. Ehlke |

JUSTICES:

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

    For the defendants-appellants-petitioners, there were briefs filed by *Misha Tseytlin, Kevin M. LeRoy* and *Troutman Pepper Hamilton Sanders*, Chicago. There was an oral argument by *Misha Tseytlin*.

    For the plaintiffs-respondents, there was a brief filed by *Lester A. Pines, Tamara B. Packard, Aaron G. Dumas, Leslie A. Freehill, Beauregard W. Patterson* and *Pines Bach LLP,* Madison. There was an oral argument by *Lester A. Pines*.

There was an amicus curiae brief filed on behalf of Wisconsin Democracy Campaign by *Jeffrey A. Mandell, Douglas M. Poland* and *Stafford Rosenbaum LLP*, Madison; and *Mel Barnes* and *Law Forward, Inc.*

**2022 WI 6**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2021AP802
(L.C. No. 2021CV589)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Andrew Waity, Judy Ferwerda, Michael Jones and Sara Bringman,**

    **Plaintiffs-Respondents,**

    **v.**

**Devin LeMahieu, in his official capacity and Robin Vos, in his official capacity,**

    **Defendants-Appellants-Petitioners.**

**FILED**

**JAN 27, 2022**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. HAGEDORN, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

APPEAL from a judgment and an order of the Circuit Court for Dane County, Stephen E. Ehlke, Judge. *Reversed and remanded.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This case is before the court on bypass pursuant to Wis. Stat. § (Rule) 809.60 (2019-20).[1] On bypass, we review an order of the Dane County

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

circuit court,[2] Waity v. LeMahieu, No. 2021CV589 (Dane Cnty. Cir. Ct. Apr. 29, 2021), granting summary judgment in favor of Respondents, Andrew Waity, Judy Ferwerda, Michael Jones, and Sara Bringman, and against Petitioners, Devin LeMahieu and Robin Vos.[3]   In its order, the circuit court enjoined the Petitioners from issuing payments under two contracts for legal services, and it declared the contracts void ab initio.

¶2   Petitioners, on behalf of the legislature, entered into contracts for attorney services regarding the decennial redistricting process and resulting litigation.   Respondents claim that Petitioners lacked authority to enter into the contracts, and they ask us to declare the agreements void ab initio.   Because Petitioners had authority under Wis. Stat. § 16.74[4] to "purchase[]" for the legislature "contractual

_____

[2] The Honorable Stephen E. Ehlke presided.

[3] Senator LeMahieu is the majority leader of the Wisconsin State Senate, while Representative Vos is Speaker of the Wisconsin State Assembly.   Together, they represent the leadership of the Wisconsin Legislature.

[4] The relevant portion of Wis. Stat. § 16.74 is provided below:

> (1) All supplies, materials, equipment, permanent personal property and contractual services required within the legislative branch shall be purchased by the joint committee on legislative organization or by the house or legislative service agency utilizing the supplies, materials, equipment, property or services. All supplies, materials, equipment, permanent personal property and contractual services required within the judicial branch shall be purchased by the director of state courts or the judicial branch agency utilizing the supplies, materials, equipment, property or services.

services," the agreements at issue were lawfully entered. The circuit court's decision to enjoin enforcement of the contracts was improper.

¶3 We reverse the circuit court's grant of summary judgment in Respondents' favor, and instead, we remand this case to the circuit court with instructions to enter judgment in favor of Petitioners. In addition, we clarify the standard for granting a stay of an injunction pending appeal. The circuit court in this case incorrectly applied that standard and refused to stay its injunction pending appeal of its decision. Further

---

. . .

    (2)(b) Contracts for purchases by the senate or assembly shall be signed by an individual designated by the organization committee of the house making the purchase. Contracts for other legislative branch purchases shall be signed by an individual designated by the joint committee on legislative organization. Contracts for purchases by the judicial commission or judicial council shall be signed by an individual designated by the commission or council, respectively. Contracts for other judicial branch purchases shall be signed by an individual designated by the director of state courts.

. . .

    (4) Each legislative and judicial officer shall file all bills and statements for purchases and engagements made by the officer under this section with the secretary, who shall audit and authorize payment of all lawful bills and statements. No bill or statement for any purchase or engagement for the legislature, the courts or any legislative service or judicial branch agency may be paid until the bill or statement is approved by the requisitioning or contracting officer under sub. (2).

3

explanation from this court is needed to ensure the standard for stays pending appeal is correctly followed in the future.

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4 For decades, the Wisconsin Legislature has hired attorneys to provide competent legal advice on redistricting. Faced with the inherent challenges of drawing new political boundaries in the state, described both as a "thicket," Jensen v. Wis. Elections Bd., 2002 WI 13, ¶11, 249 Wis. 2d 706, 639 N.W.2d 537, and "a critical . . . part of politics," Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484, 2498 (2019), the legislature has repeatedly consulted specialists to assist them in developing maps and to prepare for subsequent litigation. See Jensen, 249 Wis. 2d 706, ¶10 ("[R]edistricting is now almost always resolved through litigation rather than legislation . . . ."); see also, e.g., Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630 (E.D. Wis. 1982) (redistricting litigation for the 1980 census); Prosser v. Elections Bd., 793 F. Supp. 859 (W.D. Wis. 1992) (litigation regarding redistricting after the 1990 census); Baumgart v. Wendelberger, Nos. 01-0121 & 02-C-0366, unpublished slip op. (E.D. Wis. May 30, 2002) (redistricting litigation surrounding the 2000 census); Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840 (E.D. Wis. 2012) (litigation challenging maps enacted by the Wisconsin Legislature and signed by the governor after the 2010 census); Johnson v. WEC, No. 2021AP1450-OA, unpublished order (Wis. Sept. 22, 2021, amend. Sept. 24, 2021)

4

(granting petition for leave to commence an original action on redistricting for the 2020 census).

¶5 For the 1980 and 1990 redistricting processes, the legislature hired attorneys to provide advice and represent its interests in litigation in federal and state court. Similarly, for the 2000 and 2010 processes, the Senate Committee on Organization authorized payments for attorney services for the Wisconsin Senate, while the Wisconsin Assembly obtained counsel for redistricting through separate agreements.

¶6 In line with historical precedent, the substantial legislative demands redistricting created, and the need for pre-litigation advice, both houses of the legislature retained legal counsel for the 2020 redistricting process. On December 23, 2020, Petitioners, on behalf of the senate and assembly, executed an attorney services contract to begin on January 1, 2021, with the law firm Consovoy McCarthy PLLC ("Consovoy"), in association with Attorney Adam Mortara. Consovoy and Mortara agreed to consult with the legislature on "possible litigation related to decennial redistricting," "provide strategic litigation direction," and "provide . . . day-to-day litigation resources."[5]

¶7 On January 5, 2021, the Committee on Senate Organization issued authorization for purchase of attorney services. The committee voted to "authorize[] the senate . . . to retain and hire legal counsel" for

---

[5] The agreement was revised and re-signed on March 3, 2021.

redistricting. The authorization was to remain "in force the entire 2021-2022 legislative session," and it provided Senator LeMahieu with the authority to "approve all financial costs and terms of representation."

¶8 On January 6, 2021, Senator LeMahieu, acting on behalf of the senate, signed an engagement agreement with the law firm Bell Giftos St. John LLC ("BGSJ"). The firm agreed to advise the legislature on redistricting, including the "constitutional and statutory requirements," "the validity of any draft redistricting legislation," and for "judicial . . . proceedings relating to redistricting."

¶9 On March 24, 2021, the Committee on Assembly Organization followed the lead of the senate committee and voted to authorize Speaker Vos to "hire . . . law firms, entities or counsel necessary related to . . . legislative redistricting." In addition, the committee noted that Speaker Vos "has always [been] authorized" to contract for attorney services "beginning on January 1, 2021."

¶10 To perform their contract obligations, the legislature followed the same procedure it follows for all billings and expenditures for the legislative branch. A bill or statement was provided to business managers at the senate and assembly. The managers entered the billing information into an online software program called PeopleSoft; the information in PeopleSoft was checked by the chief clerks, who then approved the purchases and transmitted the information to the Department of Administration ("DOA"). The DOA, as with all purchases made

by the legislature, received details through the PeopleSoft software on the payments requested by the legislature. The agency received: (1) the names of the billing entities and individuals (here the law firms contracted to provide services); (2) invoice codes specific to the purchases at issue; (3) invoice dates; (4) total dollar amounts requested; and (5) a general accounting code that categorized the types of purchases requested, i.e., legal services. After receiving this information from the legislature, DOA approved the purchases and transferred the requested funds to the senate and assembly.

¶11 On March 10, 2021, Respondents filed this taxpayer lawsuit in Dane County circuit court. They sought a declaration that the two attorney services agreements the legislature entered into were void ab initio. The complaint alleged that no legal authority permitted the Petitioners to sign the contracts on behalf of the senate and assembly. Soon after filing the complaint, Respondents moved for a temporary injunction barring the legislature from issuing payment under the attorney services contracts and prohibiting Petitioners from seeking legal advice other than from the Wisconsin Department of Justice.

¶12 Petitioners moved to dismiss the complaint. After a hearing, the circuit court denied the request for a temporary injunction and converted Petitioners' motion to dismiss into a motion for summary judgment.[6] The circuit court ordered

---

[6] Under Wis. Stat. § 802.06(2)(b), a motion to dismiss for failure to state a claim is converted into a motion for summary judgment where "matters outside of the pleadings are presented to and not excluded by the court."

7

additional briefing. In a response brief to the motion for summary judgment, Respondents stated that the court should not only deny Petitioners' motion, but also grant summary judgment in Respondents' favor.

¶13 On April 29, 2021, the circuit court issued a written decision agreeing with Respondents. The circuit court held that there was not statutory or constitutional authority by which Petitioners could enter into and perform on the attorney engagement agreements with Consovoy, Mortara, and BGSJ. Specifically, the court quoted Wis. Stat. § 16.74(1), which states, in relevant part: "All supplies, materials, equipment, permanent personal property and contractual services required within the legislative branch shall be purchased by the joint committee on legislative organization or by the house or legislative service agency utilizing the supplies, materials, equipment, property or services." (Emphasis added.) The circuit court read the provision as allowing the legislature to purchase supplies, materials, and contractual services, but only contractual services that are "relate[d] to" and "required" by purchases of other physical property. Thus, while the legislature could hire a repairman to inspect an air conditioning unit, it could not contract for stand-alone attorney services. In addition, the circuit court held that, while the legislature "could probably . . . hire counsel to review [redistricting maps] it has drawn," it could not legally enter into the contracts at issue because the agreements were

8

"preemptive" and "litigation . . . may not even occur."[7] Thus, the circuit court declared the relevant contracts void ab initio and enjoined Petitioners from authorizing any further payments under the contracts.

¶14 The day after the circuit court issued its opinion, Petitioners filed a notice of appeal and an emergency motion for a stay pending appeal. On May 10, 2021, the circuit court held a hearing and denied the request for a stay. In so doing, the circuit court reviewed the arguments the Petitioners advanced and noted that it "disagree[d] with their legal analysis." The circuit court reiterated that it had considered the caselaw in support of Petitioners' position and it "reaffirm[ed]" its conclusions of law. In its reasoning, the circuit court noted that Petitioners had "re-present[ed] . . . what was originally before [the circuit court]." The circuit court reasoned that it would "merely be repeating what [it] already set forth" in the April 29 opinion. Consequently, the circuit court held that Petitioners were unlikely to succeed on appeal. The circuit court continued, stating that Petitioners would not suffer irreparable harm because they could rely on institutions such as the Attorney General's office for legal advice, and Petitioners could hire private firms if redistricting litigation was initiated. Finally, according to the circuit court, because the

---

[7] In addition, the circuit court held that Petitioners did not have independent authority to enter into the contracts under Wis. Stat. § 13.124, Wis. Stat. § 20.765, or the legislature's powers under the Wisconsin Constitution.

9

contracts constituted unauthorized expenditure of public funds, harm would befall the general public, and a stay was not warranted.

¶15 On May 12, 2021, Petitioners filed a motion for a stay pending appeal at the court of appeals. On June 29, 2021, two months after the circuit court enjoined enforcement of the attorney services contracts, the court of appeals issued a decision, declining Petitioners' request for a stay. Waity v. LeMahieu, No. 2021AP802, unpublished order (Wis. Ct. App. June 29, 2021). The court of appeals explained that the circuit court properly analyzed the relevant standard, and its decision was not an erroneous exercise of discretion. Id. at 6-7.

¶16 On June 30, 2021, Petitioners filed with this court a petition to bypass the court of appeals and a motion to stay the circuit court's injunction pending appeal. On July 15, 2021, we granted the Petitioners' request to bypass the court of appeals, and, in an unpublished order, granted the motion for stay. Waity v. LeMahieu, No. 2021AP802, unpublished order (Wis. July 15, 2021) (granting motion for relief pending appeal). In so doing, we analyzed the circuit court's stay analysis and concluded that the circuit court misapplied the relevant standard.

10

## II. STANDARD OF REVIEW

¶17 In this case, we are asked to review motions for summary judgment.[8] "Whether the circuit court properly granted summary judgment is a question of law that this court reviews de novo." Racine County v. Oracular Milwaukee, Inc., 2010 WI 25, ¶24, 323 Wis. 2d 682, 781 N.W.2d 88 (quotations omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). A party opposing summary judgment "'may not rest upon the mere allegations or denials of the pleadings' but instead, through affidavits or otherwise, 'must set forth specific facts showing that there is a genuine issue for trial.'" Oracular Milwaukee, 323 Wis. 2d 682, ¶26 (quoting Wis. Stat. § 802.08(3) (2007-08)).

¶18 This case also presents questions of statutory interpretation. "Interpretation of a statute is a question of law that we review de novo, although we benefit from the analyses of the circuit court and the court of appeals." Estate of Miller v. Storey, 2017 WI 99, ¶25, 378 Wis. 2d 358, 903 N.W.2d 759. "[S]tatutory interpretation begins with the

---

[8] Petitioners originally moved to dismiss the complaint, which the circuit court converted into a motion for summary judgment. See Wis. Stat. § 802.06(2)(b). In response to the motion, at the circuit court, Respondents requested summary judgment in their favor. We review the cross motions for summary judgment on appeal.

11

language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry. Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citations and quotations omitted). In addition, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46.

## III. ANALYSIS

¶19 The Respondents argue that Petitioners lacked any legal authority to enter into legal contracts with Consovoy, Mortara, and BGSJ. In response, Petitioners claim that, at a minimum, Wis. Stat. § 16.74 provides Petitioners, acting on behalf of the legislature, the necessary authority.[9] Petitioners argue that the circuit court erred in granting summary judgment in Respondents' favor, and that in fact, summary judgment is warranted in favor of Petitioners.

¶20 We agree with the Petitioners. For the reasons provided below, Wis. Stat. § 16.74 grants the legislature

---

[9] Petitioners also argue that they had authority to enter the legal services contracts under Wis. Stat § 13.124, Wis. Stat. § 20.765, and the Wisconsin Constitution. Because we hold that Wis. Stat. § 16.74 provides Petitioners independent legal authority to enter the contracts, we will not address Petitioners' other claims.

12

authority to enter into legal contracts to assist in redistricting and related litigation.

¶21 In addition, we address the circuit court's decision to deny a stay of its injunction pending appeal. The circuit court misapplied the standard for granting stays pending appeal. Although we reversed the circuit court's decision in an unpublished order on July 15, 2021, additional explanation of our prior decision is needed to ensure compliance with the law.

A. The Legislature's Authority To Enter
Into Legal Services Contracts Under Wis. Stat. § 16.74.

1. The circuit court decision

¶22 Wisconsin Stat. § 16.74(1), titled "Legislative and judicial branch purchasing," states that "[a]ll supplies, materials, equipment, permanent personal property and contractual services required within the legislative branch shall be purchased by the joint committee on legislative organization or by the house or legislative service agency utilizing the supplies, materials, equipment, property or services." The circuit court reasoned that, although the legislature could purchase some services under this agreement, because the legal services at issue were not related to other "supplies, materials, equipment, [or] permanent personal property," the legal services fell outside the scope of the statute.

¶23 The circuit court misinterpreted Wis. Stat. § 16.74. The statute explicitly permits each house of the legislature to purchase "contractual services" that are "required within the

13

legislative branch." § 16.74(1). The text of § 16.74 does not state that purchase of services must be tied to other physical property purchases. In fact, Wis. Stat. § 16.70(3) defines "contractual services" under § 16.74 to include "all services, materials to be furnished by a service provider in connection with services, and any limited trades work involving less than $30,000 to be done for or furnished to the state or any agency." (Emphasis added.) In § 16.74, the legislature did not enact a limited purchasing power.

¶24 "Service" is defined as "[t]he action or fact of working or being employed in a particular capacity (irrespective of whom the work is done for)." Service, Oxford English Dictionary (2021); see also service, Black's Law Dictionary (11th ed. 2019) ("Labor performed in the interest or under the direction of others."). The term "contractual services" includes the provision of work or labor to another in exchange for compensation, under an enforceable agreement. Unambiguously, this includes the provision of legal services under contract.

¶25 The circuit court's statutory interpretation appears to rely heavily on logic embodied in the noscitur a sociis canon. However, the canon does not alter our conclusion. Noscitur a sociis serves to read in context ambiguous terms that could be defined literally in a manner conflicting with the statute's plain meaning. Therefore, in the list "tacks, staples, nails, brads, screws, and fasteners," the word "staples" should not be read to mean "reliable and customary

14

food items." Antonin Scalia & Bryan A Garner, Reading Law: The Interpretation of Legal Texts 196 (2012); see also Stroede v. Soc'y Ins., 2021 WI 43, ¶¶1, 19, 397 Wis. 2d 17, 959 N.W.2d 305 (interpreting a list of "possessor[s] of real property," which included "owner, lessee, tenant, or other lawful occupant of real property," to not encompass a patron at a bar who lacked "possession or control over the property" (citing Wis. Stat. § 895.529 (2017-18)).

¶26 The term "contractual services" under Wis. Stat. § 16.74 is unambiguous and includes attorney services. See Benson v. City of Madison, 2017 WI 65, ¶31, 376 Wis. 2d 35, 897 N.W.2d 16 (holding that the term "corporation" was unambiguous and thus there was "no need to resort to the [noscitur a sociis] canon"). Furthermore, the broad scope of "contractual services" is in harmony with the shared meaning of "supplies, materials, equipment, [and] permanent personal property" under § 16.74(1) as all items in the list must, by statute, be "required within the legislative branch." See State v. Quintana, 2008 WI 33, ¶35, 308 Wis. 2d 615, 748 N.W.2d 447 (noting that, under the noscitur a sociis canon, a list of specific items indicated a general common meaning which permitted an "expansive, not restrictive" reading of the statute).

¶27 Confirming the plain meaning and statutory definition of "contractual services," the official legislative annotation of Wis. Stat. § 16.70(3) states that "'[c]ontractual services'

15

include technical and professional services."[10] Wis. Stat. § 16.70, historical note (citing 65 Wis. Op. Att'y Gen. 251 (1976)); see Madison Metro. Sch. Dist. v. Cir. Ct. for Dane Cnty., 2011 WI 72, ¶65 n.12, 336 Wis. 2d 95, 800 N.W.2d 442 (stating that, although "titles and histor[ical] notes" are not part of statutes, "they provide valuable clues to the meaning of statutory text" (citing Wis. Stat. § 990.001(6) (2007-08))). Of course, attorneys are considered professionals.

¶28 The circuit court also held that the attorney services contracts at issue were not "required within the legislative branch" under Wis. Stat. § 16.74 because redistricting

---

[10] The legislative annotation relies on an Attorney General opinion from 1976, which interpreted the meaning of "contractual services" under the version of Wis. Stat. § 16.70 that existed at the time. 65 Wis. Op. Att'y Gen. 251 (1976); see Milwaukee J. Sentinel v. City of Milwaukee, 2012 WI 65, ¶41, 341 Wis. 2d 607, 815 N.W.2d 367 ("The opinions of the Attorney General are not binding on the courts but may be given persuasive effect."). The definition in 1976 had no material differences to the current version. See Wis. Stat. § 16.70 (1975-76) (defining "contractual services" to include "all materials and services"). In the opinion, the Attorney General reviewed the legislative history of § 16.70 and explained that a prior version of the statute was amended to define "contractual services" to include "all . . . services." 65 Wis. Op. Att'y Gen. at 255-56. When making that change, the legislature was concerned that the prior version of the statute excluded "technical and professional services." Id. Thus, the Attorney General concluded that § 16.70's definition of "contractual services" included professional services, such architectural and engineering consulting services. Id. at 252. This legislative history confirms the plain language of § 16.70. Teschendorf v. State Farm Ins. Co., 2006 WI 89, ¶14, 293 Wis. 2d 123, 717 N.W.2d 258 ("[I]f the meaning of the statute is plain, we sometimes look to legislative history to confirm the plain meaning."). "Contractual services" under § 16.70 extends to all professional services, including legal services.

16

litigation had not yet begun. Of course, in cases of complex litigation, legal advice to prepare clients for upcoming court proceedings, develop legal strategies, and mitigate litigation risk can be of material significance. Understanding the stakes and potential consequences of a given action——here, a redistricting map——may serve to ensure greater legal compliance, reduce the need for judicial intervention, and lower burdens on the court system. There is no support found in either the text of § 16.74 or in basic principles of litigation practice that counseling prior to the filing of a lawsuit is not worthwhile or helpful. In fact, it can be of equal or greater importance than representation in subsequent legal proceedings. This is especially true in an area such as redistricting, where multiple levels of law from both state and federal sources present substantial compliance difficulties to even the most astute legal mind, and litigation is extraordinarily likely, if not inevitable. Jensen, 249 Wis. 2d 706, ¶10 ("[R]edistricting is now almost always resolved through litigation rather than legislation . . . .").

¶29 Furthermore, any distinction between the existence and nonexistence of a present lawsuit is largely unworkable. While the legislature may have authorization to purchase legal services under Wis. Stat. § 16.74 once a lawsuit was initiated, under the circuit court's reasoning, the legislature would be prohibited from hiring counsel to file a lawsuit on its behalf, as no lawsuit would exist prior to the lawsuit being filed. Such an interpretation is absurd. See Kalal, 271 Wis. 2d 633,

17

¶46 (stating that statutes must be interpreted "reasonably, to avoid absurd or unreasonable results").

¶30 The parties do not dispute that Petitioners, on behalf of the legislature, contracted with Consovoy and Mortara to provide advice and strategic direction on redistricting litigation. BGSJ was contracted to review "constitutional and statutory requirements" and the "validity of any draft redistricting legislation," as well as to assist the legislature in redistricting-related legal proceedings.

¶31 It strains credulity to conclude that the need for legal advice in this area was fictitious or somehow disconnected from legitimate legislative activities. Every ten years, the legislature is constitutionally responsible for drawing district boundaries in this state. See Jensen, 249 Wis. 2d 706, ¶6 (noting that the Wisconsin Constitution gives "the state legislature the authority and responsibility" to draw district boundaries); Wis. Const. art. IV, § 3 ("[T]he legislature shall apportion and district anew the members of the senate and assembly . . . ."). The legislature clearly has a constitutionally-rooted institutional interest in litigating redistricting disputes.

¶32 The undisputed facts show that, in line with decades of bipartisan precedent, the Senate and Assembly Committees on Organization determined that the hiring of legal counsel to assist with redistricting was needed. By taking these votes, the legislature rationally took steps to make more informed decisions in drawing maps, navigate extraordinarily complex

18

legal issues, and prepare for related litigation. As a matter of law, there is no genuine dispute of fact that the attorney services contracts were "required within the legislative branch" under Wis. Stat. § 16.74. See Wis. Stat. § 802.08(2).

### 2. The Respondents' arguments

¶33 The Respondents' arguments on appeal move away from the circuit court's legal reasoning. Instead, they claim that Wis. Stat. § 16.74 contains no conferral of purchasing authority at all. According to Respondents, some other statutory provision must provide authority to the legislature to make basic purchasing decisions. Under Respondents' theory, § 16.74 simply identifies which entities may make purchases for the legislature and the procedure by which those purchases are completed.

¶34 Wisconsin Stat. § 16.74(1) confirms that "supplies, materials, equipment, permanent personal property and contractual services," must be purchased by the joint committee on legislative organization, a house of the legislature, or a legislative service agency to the extent that the purchases are "required within the legislative branch." By the very operation of this provision, those entities entitled to make purchases must have, under the statute, the legal authority to do so. If no authority exists, the responsibility to make "purchase[s]" under the statute would have little applicability or utility. The statute includes no indication, explicit or implicit, that purchasing authority is vested, defined, or limited by other statutory provisions. For example, § 16.74(1) does not state,

19

"If authorized" under a different statute, "[a]ll supplies, materials, equipment, permanent personal property and contractual services" shall be purchased. Instead, the provision states, without ambiguity, that such goods and services "shall be purchased" to the extent they are needed by the legislature. Respondents fail to cite a conflicting provision in the Wisconsin code that ties purchases under § 16.74 to separate statutory provisions.

¶35 In other words, for the plain text of Wis. Stat. § 16.74(1) to have effective meaning, the legislature must have the authority to make purchases under the provision. This basic principle is not foreign to our jurisprudence. For example, in Bank of New York Mellon v. Carson, we interpreted a foreclosure statute which stated, upon a court's finding of abandonment, a judgment "shall be entered" which indicates that "the sale of such mortgaged premises shall be made upon the expiration of 5 weeks from the date [of judgment]." 2015 WI 15, ¶20, 361 Wis. 2d 23, 859 N.W.2d 422 (quoting Wis. Stat. § 846.102 (2011-12)). We interpreted the statute to provide "the circuit court the authority to order a bank to sell the property." Id. Further, Wis. Stat. § 808.03(2) states that a civil "judgment or order [of a circuit court] . . . may be appealed to the court of appeals in advance of a final judgment or order" if certain conditions are met. Naturally, we have read § 808.03(2) to provide litigants with the ability to "appeal[] by permission." Heaton v. Larsen, 97 Wis. 2d 379, 397, 294 N.W.2d 15 (1980).

20

¶36 When interpreting Wis. Stat. §§ 846.102(1) and 808.03(2), we did not demand separate statutory authority for a court to order a foreclosure sale or for a litigant to appeal by permission of the court. Such authority was inherent in the plain meaning and operation of the statutes. We did not read § 846.102(1) as solely describing the content of foreclosure judgments, and we did not read § 808.03(2) as merely explaining conditions precedent to appeal. Contrary to Respondents' claims, Wis. Stat. § 16.74, like §§ 846.102(1) and 808.03(2), does not only identify the individuals or entities who <u>may</u> have legal authority to make legislative branch purchases if another statute says as much, nor does the provision serve only to clarify procedure for making such purchases. Instead, § 16.74 is an independent grant of legal authority by which the legislature can buy the goods and services it needs.[11]

¶37 The context of Wis. Stat. § 16.74 confirms this plain meaning. <u>See</u> <u>Kalal</u>, 271 Wis. 2d 633, ¶46 ("[S]tatutory language

---

[11] Similarly, Article I, Section 4 of the United States Constitution states that, "The times, places and manner of holding elections for senators and representatives, <u>shall be prescribed</u> in each state <u>by the legislature thereof</u>." (Emphasis added.) Wisconsin Stat. § 16.74(1), which states "[a]ll . . . contractual services required within the legislative branch shall be purchased by . . . the house or legislative service agency utilizing [the services]," uses an almost identical linguistic structure. It is not seriously disputed that, under the text of Article I, Section 4, states are vested the authority to regulate the manner of federal elections. <u>See</u> <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779, 805 (1995) (explaining that the provision is an "express delegation[] of power to the States to act with respect to federal elections").

is interpreted in the context in which it is used . . . ."). Section 16.74(3) states that the individuals "authorized to make purchases or engage services under this section [16.74] may prescribe the form of . . . contracts for the purchases and engagements." (Emphasis added.) Similarly, § 16.74(4) states that "bills and statements for purchases and engagements" made "under this section" must be submitted to the DOA. (Emphasis added.) These provisions heavily imply that § 16.74 provides an independent basis by which the legislature can make purchases. It would be deeply counterintuitive for § 16.74 to specify that purchases are made under its own terms when, in fact, a completely separate, unidentified statute confers the needed legal authority to make the purchases. By stating that purchases are made under § 16.74, the legislature confirmed that, indeed, purchases can be made under the statute. Respondents' arguments are not supported by the text of § 16.74 and cannot be accepted. See Kalal, 271 Wis. 2d 633, ¶45 ("If the meaning of the statute is plain, we ordinarily stop the inquiry." (quotations omitted)).[12]

_____

[12] It is noteworthy that Wis. Stat. § 16.74 also provides the statutory basis for making judicial branch purchases. See § 16.74(1) ("All supplies, materials, equipment, permanent personal property and contractual services required within the judicial branch shall be purchased by the director of state courts . . . ."). An almost identically worded statute provides the DOA with the authority to complete necessary purchases "for all [executive branch] agencies." Wis. Stat. § 16.71(1); see, e.g., Glacier State Dist. Servs. v. DOT, 221 Wis. 2d 359, 362, 585 N.W.2d 652 (Ct. App. 1998) (noting that all purchases for "the de-icing of state highways" in Wisconsin were made under § 16.71). If Respondents' interpretation were correct, legal uncertainty would surround basic purchases by the legislative,

¶38 Putting aside the question of purchasing authority under Wis. Stat. § 16.74, Respondents claim that a more specific statute for hiring attorneys applies and thus, Petitioners cannot rely on § 16.74 to enter into the contracts with Consovoy, Mortara, and BGSJ. Wisconsin Stat. § 13.124 states that the senate majority leader or the assembly speaker, or both, may at their "sole discretion," "obtain legal counsel other than from the department of justice . . . in any action in which the [senate or assembly] is a party or in which the interests of the [senate or assembly] are affected, as determined by the [senate majority leader or speaker]." § 13.124(1)(b), (2)(b). It is true that "where two conflicting statutes apply to the same subject, the more specific statute controls." Lornson v. Siddiqui, 2007 WI 92, ¶65, 302 Wis. 2d 519, 735 N.W.2d 55; see also Scalia & Garner, supra ¶25, at 183 ("The general/specific canon . . . deals with what to do when conflicting provisions simply cannot be reconciled . . . ."). However, "conflicts between different statutes, by implication or otherwise, are not favored and will not be held to exist if they may otherwise be reasonably construed." State ex rel. Hensley v. Endicott, 2001 WI 105, ¶19, 245 Wis. 2d 607, 629 N.W.2d 686.

¶39 Here, there is no statutory conflict that bars the use of Wis. Stat. § 16.74 to purchase attorney services. Under a

_____

judicial, and executive branches. Under what authority, for instance, would courts be able to buy note pads on which judges and clerks write?

23

plain reading of Wis. Stat. § 13.124, the provision applies only where there is an "action" in which the senate or assembly are parties, or their interests are affected. The provision also vests authority solely in the discretion of the senate majority leader and assembly speaker. By contrast, § 16.74 grants the legislature authority to purchase attorney services, but only if approved by "the joint committee on legislative organization or by the house or legislative service agency" using the services. There is no limitation in § 16.74 that the purchase be made for an "action" like in § 13.124. Thus, § 13.124 provides a quick, streamlined basis for the legislature's leadership to obtain counsel for the legislature in "any action." By contrast, § 16.74 allows each house of the legislature to obtain counsel as needed, irrespective of whether an "action" exists. Sections 13.124 and 16.74 are different statutes that apply in distinct circumstances. They provide separate statutory authority for the hiring of attorneys, and the general/specific cannon does not apply.[13] See Lornson, 302 Wis. 2d 519, ¶65 (requiring "conflicting statutes"); Endicott, 245 Wis. 2d 607, ¶19 (noting that interpretations rendering statutes in conflict are disfavored in the law).

¶40 In addition, Respondents claim that, even if Wis. Stat. § 16.74 provides the legislature authority to contract for

_____

[13] We reserve, without deciding, the question of whether Wis. Stat. § 13.124 provided the Petitioners authority, independent of Wis. Stat. § 16.74, to enter into attorney services contracts prior to the initiation of a redistricting lawsuit.

24

attorney services, Petitioners did not comply with procedural requirements. Under § 16.74(1), purchases must be made by "the joint committee on legislative organization or by the house or legislative service agency utilizing the" goods or services. "Contracts for purchases by the senate or assembly shall be signed by an individual designated by the organization committee of the house making the purchase." § 16.74(2)(b).

¶41 Here, the undisputed facts show that the Senate and Assembly Committees on Organization, who were designated by their respective houses to review and complete purchases for attorney services, vested the Petitioners with authority to enter into the contracts with Consovoy, Mortara, and BGSJ. On January 5, 2021, the Committee on Senate Organization approved the hiring of attorneys for redistricting and explicitly granted Senator LeMahieu authority to enter into contracts. Further, on March 24, 2021, the Committee on Assembly Organization vested Speaker Vos with the authority to hire counsel for redistricting, noting that Speaker Vos had "always [been] authorized" to contract for attorney services.

¶42 Respondents note that the agreement with Consovoy and Mortara was signed on December 23, 2020, and the Senate and Assembly Committees on Organization approved the hiring of counsel after that date, on January 5 and March 24, 2021, respectively. Therefore, the legislature indisputably approved the attorney agreements signed by Petitioners in January and March 2021. It is well established that a contract is valid, even if originally signed by an agent without authority, when

25

the principal subsequently ratifies the agreement and agrees to be bound by its terms. See M&I Bank v. First Am. Nat'l Bank, 75 Wis. 2d 168, 176, 248 N.W.2d 475 (1977) (explaining that "[r]atification is the manifestation of intent to become party to a transaction purportedly done on the ratifier's account"); Restatement (Second) of Contracts §380 cmt. a (1981) ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract."); see, e.g., Milwaukee J. Sentinel v. DOA, 2009 WI 79, 319 Wis. 2d 439, 768 N.W.2d 700 (reviewing a public records law challenge to a statute enacted by the legislature to ratify a previously negotiated collective bargaining agreement). The legislature adopted the contracts at issue, even given the fact that it did so after the agreements were signed. The agreements are valid and enforceable.

¶43 Respondents also claim that the contracts are void because the legislature failed to provide adequate information to the DOA, and the payments to Consovoy, Mortara, and BGSJ were not properly audited. Wisconsin Stat. § 16.74(4) states that "[e]ach legislative and judicial officer shall file all bills and statements for purchases and engagements made by the officer under this section with the secretary [of the DOA], who shall audit and authorize payment of all lawful bills and statements."

¶44 It is undisputed that the legislature submitted information on bills from the relevant attorney services contracts to the DOA. Petitioners submitted undisputed evidence that, as with all purchases for the legislature, including

26

attorney services, information from the bills was inputted into a software program, PeopleSoft. A business manager submitted basic accounting details, such as the name of the billing entities, transaction-specific invoice codes, invoice dates, the amount of funds needed, and the general accounting code describing the subject matter of the transaction, i.e., legal services. The information was reviewed by at least two employees at the legislature, including the chief clerks, and was then transferred to the DOA for review. The DOA received the information and issued payments. The uncontested facts show that the legislature properly allowed the DOA to audit and review "bills and statements" for the attorney services at issue. Wis. Stat. § 16.74(4).

¶45 Respondents cite a response to a public records request provided by DOA's Chief Legal Counsel, Ann Hanson, which stated that the DOA did not have access to bills and statements that originated from Consovoy and BGSJ. However, DOA's response also indicated that the DOA was given payment requests and, in fact, issued payments. Clearly, at the time of the payments, DOA believed the legislature had provided sufficient information to review the requests and comply with Wis. Stat. § 16.74's procedural requirements. As with all purchasing requests submitted by the legislature, DOA had online access to the information taken from the attorney services bills submitted through PeopleSoft. The fact that the legislature, working with the DOA, streamlined the acquisitions process and transitioned to software programs in lieu of submitting original billing

27

statements is of no legal significance. As required by § 16.74, the DOA had access to basic accounting information for the purchases at issue, and, predictably, the DOA issued payments.

¶46 To the extent that DOA failed to perform a proper audit under Wis. Stat. § 16.74 of the legislature's purchasing requests, Respondents must direct their complaint toward the DOA, not the legislature. Section 16.74(4) unambiguously vests the duty to "audit and authorize payment[s]" with the DOA. Respondents cite no legal authority that the legislature had the obligation or responsibility to oversee DOA's internal auditing process. In this case, DOA received billing requests and information, responded to the legislature, and issued payments. If, in doing so, DOA failed to fully perform its administrative duties, purchasing by the legislature under § 16.74 cannot be ground to a halt.[14]

¶47 In all, the legislature complied with Wis. Stat. § 16.74 and received the payments it properly approved, validated, and requested. Consequently, as a matter of law, summary judgment in Petitioners' favor is warranted.[15]

---

[14] Furthermore, any failure of those authorized to make purchases under Wis. Stat. § 16.74 to provide information to the DOA for audit would implicate the legality of payments for the legal services contracts, not the legality of the contracts themselves. There is no substantiated argument that failing to send proper documentation to the DOA would render the contracts unenforceable. While Respondents filed this lawsuit in part to bar payments under the contracts, if Petitioners violated § 16.74's audit procedures as Respondents allege, the separate remedy of declaring the contracts void ab initio would not be appropriate.

[15] The dissent does not dispute that attorney services

28

B. The Standard For Stays Pending Appeal

¶48 After awarding summary judgment in Respondents' favor, the circuit court in this case enjoined Petitioners from

---

constitute "contractual services" under Wis. Stat. § 16.74, nor does it claim, as do the Respondents, that § 16.74 fails to provide independent legal authority to complete legislative purchases. Instead, the dissent advances a distinct statutory interpretation undeveloped by Respondents on appeal. It notes that § 16.74(1) permits purchases by "the joint committee on legislative organization or by the house or legislative service agency utilizing" the goods or services, and it claims that neither the joint committee nor the senate or assembly as a whole voted to approve the contracts at issue. Yet, the statute does not bar the senate or assembly from designating committees to complete purchases on behalf of the two houses. It is well understood that the legislature adopts and utilizes internal rules to "govern[] how it operates." Custodian of Recs. for Legis. Tech. Servs. Bureau v. State, 2004 WI 65, ¶28, 272 Wis. 2d 208, 680 N.W.2d 792; see also League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶39, 387 Wis. 2d 511, 929 N.W.2d 209 (noting that the legislature has the discretion "to determine for itself the rules of its own proceedings"); see, e.g., Flynn v. DOA, 216 Wis. 2d 521, 531-32, 576 N.W.2d 245 (1998) (explaining that the legislature delegated to a committee the authority to narrow and eliminate alternatives of proposed legislation). The senate and assembly may, as was done in this case, appoint committees on organization to approve necessary purchases on behalf of the two houses. Under the dissent's reading, if purchases are not made through the joint committee on organization, the entirety of each house would be forced to vote on specific, and often mundane, legislative purchases. The text of § 16.74 does not require the legislature to engage in such inefficient practices. In fact, § 16.74 expressly contemplates the designation of committees to facilitate necessary purchasing. The statute states that contracts for purchases by either house must be signed "by an individual designated by the organization committee of the house making the purchase." § 16.74(2)(b) (emphasis added); see State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used . . . ."). That is exactly what occurred in this case.

29

performing the attorney-services contracts signed with Consovoy, Mortara, and BGSJ. In addition, the circuit court declined to issue a stay of the injunction pending appeal. In July 2021, we reversed that decision in an unpublished order. See Waity v. LeMahieu, No. 2021AP802, unpublished order (Wis. July 15, 2021) (granting motion for relief pending appeal). We now take the opportunity to explain our decision.

¶49 Courts must consider four factors when reviewing a request to stay an order pending appeal:

> (1) whether the movant makes a strong showing that it is likely to succeed on the merits of the appeal;

> (2) whether the movant shows that, unless a stay is granted, it will suffer irreparable injury;

> (3) whether the movant shows that no substantial harm will come to other interested parties; and

> (4) whether the movant shows that a stay will do no harm to the public interest.

See State v. Scott, 2018 WI 74, ¶46, 382 Wis. 2d 476, 914 N.W.2d 141. At times, this court has also noted that "[t]emporary injunctions are to be issued only when necessary to preserve the status quo." Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977). The relevant factors "are not prerequisites but rather are interrelated considerations that must be balanced together." State v. Gudenschwager, 191 Wis. 2d 431, 440, 529 N.W.2d 225 (1995).

¶50 On appeal, a circuit court's decision to grant or deny a motion to stay is reviewed under the erroneous exercise of

discretion standard. Id. at 439. The circuit court's decision must be affirmed if it "examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." Lane v. Sharp Packaging Sys., Inc., 2002 WI 28, ¶19, 251 Wis. 2d 68, 640 N.W.2d 788. In this case, the circuit court erroneously exercised its discretion by applying an incorrect legal standard.

¶51 First, in reviewing whether Petitioners made "a strong showing that [they were] likely to succeed on the merits of the appeal," the circuit court repeatedly referred to its own legal reasoning employed when it granted summary judgment and issued an injunction in favor of Respondents. The circuit court noted that it "disagree[d] with [Petitioners'] legal analysis." It stated it reviewed the caselaw cited by Petitioners and "reaffirm[ed]" its conclusions of law. In the circuit court's view, Petitioners had, in their motion for a stay, "re-present[ed] . . . what was originally before [the circuit court]," and the circuit court would "merely be repeating what [it] already set forth" in its decision to award summary judgment and enjoin enforcement of the relevant contracts.

¶52 The circuit court's analysis was flawed. When reviewing a motion for a stay, a circuit court cannot simply input its own judgment on the merits of the case and conclude that a stay is not warranted. The relevant inquiry is whether the movant made a strong showing of success on appeal. Gudenschwager, 191 Wis. 2d at 440. Of course, whenever a party

31

is seeking a stay, there has already been a determination at the trial level adverse to the moving party. If the circuit court were asked to merely repeat and reapply legal conclusions already made, the first factor would rarely if ever side in favor of the movant. As we explained in our July 15, 2021, order, "very few stays pending appeal would ever be entered because almost no circuit court judge would admit on the record that he [or] she could have reached a wrong interpretation of the law." Waity, No. 2021AP802, unpublished order, at 9.

¶53 When reviewing the likelihood of success on appeal, circuit courts must consider the standard of review, along with the possibility that appellate courts may reasonably disagree with its legal analysis. For questions of statutory interpretation, as are presented in this case, appellate courts consider the issues de novo. See Estate of Miller, 378 Wis. 2d 358, ¶25. Here, the circuit court relied on its own interpretation of statutes such as Wis. Stat. § 16.74, which neither this court nor the court of appeals had previously interpreted, to conclude that an appeal would be meritless. Instead, the circuit court should have considered how other reasonable jurists on appeal may have interpreted the relevant

law and whether they may have come to a different conclusion.[16] If the circuit court had done so, its stay analysis would have been different. As explained above, under the plain language of § 16.74, the legislature had authority to hire counsel for redistricting, and reasonable judges on appeal could easily have disagreed with the circuit court's holdings.

¶54 When reviewing the likelihood of success on appeal, "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the plaintiff will suffer absent the stay." Gudenschwager, 191 Wis. 2d at 441. Thus, the greater the potential injury, the less a movant must prove in terms of success on appeal. However, "the movant is always required to demonstrate more than the mere possibility of success on the merits." Id. (quotations omitted).

¶55 In this case, the risk of harm to Petitioners absent a stay was substantial and irreparable. The circuit court concluded that the legislature did not suffer harm because they could obtain advice on redistricting from other government

---

[16] By contrast, appeals of decisions left primarily to the discretion of circuit courts, such as the length of a criminal sentence or the admissibility of evidence under Wis. Stat. § 904.03, have a smaller likelihood of success than appeals requiring de novo interpretation of statutes. See State v. Taylor, 2006 WI 22, ¶17, 289 Wis. 2d 34, 710 N.W.2d 466 ("A circuit court exercises its discretion at sentencing, and appellate review is limited to determining if the court's discretion was erroneously exercised."); State v. Plymesser, 172 Wis. 2d 583, 595, 493 N.W.2d 367 (1992) ("Section 904.03 gives a judge discretion to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice.").

actors such as the Attorney General. However, as explained above, redistricting presents extraordinarily complex questions of state and federal law. It is a process that takes place only every ten years; it can have a substantial effect on elections and the right to vote; and it is almost inevitable that redistricting will be litigated. Contrary to the circuit court's belief, the legislature's determination that it needed assistance from qualified specialists, outside the Attorney General's office, was abundantly reasonable.

¶56 The circuit court also mentioned in its harm analysis that litigation surrounding redistricting had not yet begun. As thoroughly discussed above, pre-litigation counsel can be indispensable when potential legislation implicates significant legal questions and litigation is highly likely.

¶57 When considering potential harm, circuit courts must consider whether the harm can be undone if, on appeal, the circuit court's decision is reversed. If the harm cannot be "mitigated or remedied upon conclusion of the appeal," that fact must weigh in favor of the movant. Waity, No. 2021AP802, unpublished order, at 11 (quoting Serv. Empls. Int'l Union v. Vos, No. 2019AP622, unpublished order, at 6-7 (Wis. June 11, 2019)). Here, due to the circuit court's order, the legislature was deprived of counsel of its choice for two and a half months. In the meantime, the demands of redistricting continued as the legislature prepared to draw new maps and the risk of litigation materialized. The circuit court failed to consider that, if its order were overturned, the legislature could not get legal

34

advice "back" for this critical time in which an injunction was in effect. Because the harm the legislature would experience absent a stay was significant, Petitioners were required to show only "more than the mere possibility of success on the merits." Gudenschwager, 191 Wis. 2d at 441 (quotations omitted). The Petitioners clearly met that standard.

¶58 By comparison, the harm to Respondents was minimal. In conducting a stay analysis, courts consider whether the movant "shows that no substantial harm will come to other interested parties." Scott, 382 Wis. 2d 476, ¶46. However, similar to the circuit court's consideration of harm to the movant, courts consider the period of time that the case is on appeal, not any harm that could occur in the future. Courts must consider the extent of harm the non-movant will experience if a stay is entered, but the non-movant is ultimately "successful in having the . . . injunction affirmed" and reinstated. Waity, No. 2021AP802, unpublished order, at 11 (quoting Serv. Empls. Int'l Union, No. 2019AP622, unpublished order, at 6-7). Thus, the stay analysis is not a mere repetition of any harm analysis conducted by the circuit court when it originally issued an order granting relief, which may consider generally all future harms to the non-movant. See Kocken v. Wis. Council 40, 2007 WI 72, ¶27 n.12, 301 Wis. 2d 266, 732 N.W.2d 828 (explaining that "[a] permanent injunction will not be granted unless there is the threat of irreparable injury that cannot be compensated with a remedy at law").

35

¶59 Here, the circuit court reasoned that Respondents were substantially harmed because "[t]ens, if not hundreds of thousands of [taxpayer] dollars . . . will be spent" under the contracts at issue. First, in making this finding, the circuit court failed to specify or tailor its cost estimates to expenses that would have been incurred while the case was on appeal, as opposed to over the course of the entire life of the contracts, e.g., until redistricting disputes are settled. Second, the harm alleged by Respondents in this case was the loss of taxpayer money. As three individuals out of a state population of 5.8 million, Respondents' harm as taxpayers was orders of magnitude less than any final dollar amount Petitioners may have improperly spent. The circuit court failed to consider this basic fiscal reality, which substantially reduced any potential harm to the Respondents. Furthermore, the circuit court failed to consider whether any financial losses to Respondents, to the extent they existed, could be recovered through a disgorgement remedy.

¶60 Finally, when reviewing the fourth factor, harm to the public interest, the circuit court reiterated that the contracts at issue would wrongfully expend public monies. The potential for unauthorized expenditures of public funds was a valid consideration of the circuit court. However, the circuit court failed also to address the public interest served in allowing the legislature to obtain needed legal advice for redistricting. The legislature has the constitutional responsibility to set district boundaries, and the process can have a material effect

36

on the rights of Wisconsin voters. See Wis. Const. art. IV, § 3. Consequently, the public is better served when the legislature has effective representation in performing redistricting and preparing for subsequent litigation. This interest was more significant, during the time period of appeal, than the public interest in preventing allegedly unauthorized expenditures.

¶61 In all, the circuit court erroneously exercised its discretion by refusing to stay its injunction pending appeal. See Lane, 251 Wis. 2d 68, ¶19.

### IV. CONCLUSION

¶62 Petitioners, on behalf of the legislature, entered into contracts for legal advice regarding the decennial redistricting process and any resulting litigation. Respondents claim that Petitioners lacked authority to enter into the contracts, and they ask us to declare the agreements void ab initio. Because Petitioners had authority under Wis. Stat. § 16.74 to "purchase[]" for the legislature "contractual services," the agreements were lawfully entered.

¶63 The circuit court's decision to enjoin enforcement of the contracts was improper. We reverse the circuit court's grant of summary judgment in Respondents' favor, and instead, we remand this case to the circuit court with instructions to enter judgment in favor of Petitioners. In addition, we clarify the standard for granting a stay of an injunction pending appeal, which the circuit court in this case incorrectly applied.

*By the Court.*—The judgment and the order of the circuit court are reversed, and the cause is remanded with instructions.

¶64 BRIAN HAGEDORN, J. *(concurring).* I join the majority opinion. I write separately, however, to respond to the dissent's misinterpretation of the majority opinion's stay analysis. In a number of cases that have crossed our desks, circuit courts rule against a party, and then, pro forma, conclude their ruling means there is little to no likelihood of success on appeal and deny a stay. That is what happened here, and this improper understanding of the law is why we reversed the circuit court's stay decision. The dissent misreads the court's discussion of this problem as if the majority is setting forth a new standard. It is not.

¶65 We adopted the Gudenschwager test to guide the determination of whether to grant a stay pending appeal.[1] The relevant factors——which encompass the likelihood of success on the merits of the appeal, the anticipated harms to the parties, and harm to the public——"are not prerequisites."[2] Rather, the factors constitute a balancing test of "interrelated considerations" that call for the court's considered judgment.[3] Of particular relevance here, the likelihood of success on appeal a movant must show "is inversely proportional to the amount of irreparable injury the [movant] will suffer absent the stay"——i.e., a sliding scale.[4] A high degree of harm paired with

---

[1] State v. Gudenschwager, 191 Wis. 2d 431, 440, 529 N.W.2d 225 (1995) (per curiam).

[2] Id.

[3] Id.

[4] Id. at 441.

1

a lower likelihood of success on appeal may be sufficient to grant a stay.[5]  And the higher the likelihood of success on appeal, the less pertinent the harm to the movant becomes.[6]

¶66  The dissent suggests that under the majority's logic, a stay must always be granted when it is possible an appellate court might disagree on a novel question of law.  Incorrect.  All the majority says on this point is that the circuit court's stay analysis should account for the standard of review on appeal.  The dissent, in contrast, seems to think that if a court disagrees with a party's legal argument, a stay will rarely be appropriate.  But that is not the law.

¶67  This case is a classic example of when the circuit court should have granted a stay pending appeal despite its conclusion on the merits.  Denying a stay deprived the legislature of the attorneys of its choice during a time it concluded legal representation was necessary.  This was a substantial harm.  Attorneys are not fungible.  The attorney-client relationship is based on trust, and the loss of timely counsel from a trusted attorney is a real deprivation.  The harm to the Respondents and the public, on the other hand, was rooted entirely in dollars and cents——allegedly unauthorized contractual payments.  This is not nothing, but it's not much, at least in this context.  Under these facts, this does not

---

[5] Though "the movant is always required to demonstrate more than a mere 'possibility' of success on the merits."  Id.

[6] Id.

2

amount to the kind of "substantial harm" <u>Gudenschwager</u> contemplates. Even accepting the circuit court's disagreement with the Petitioners' arguments, they surely had some nontrivial likelihood of persuading a higher court that their legal arguments were correct.[7] Here the Petitioners' substantial harm was paired with at least a reasonable likelihood of success on appeal, and granting a stay would bring limited harm to the Respondents and the public. Therefore, a stay was most appropriate.[8]

¶68 More importantly, the message to courts moving forward is that the likelihood of success on appeal is a flexible, sliding-

---

[7] The dissent states that when cases are not "close calls," the likelihood of success on appeal will be low. Dissent, ¶93. True enough. But this isn't one of those cases. Even without the benefit of our decision today, the circuit court should have recognized another court could reasonably disagree with its interpretation of Wis. Stat. § 16.74. Before the circuit court, no one argued for the reading of § 16.74 it articulated. That should have been a clue that another court might read the statute differently.

[8] The dissent is correct that appellate courts should not reweigh and second guess a circuit court's good faith attempts to balance the factors. Our review is under the erroneous exercise of discretion standard. <u>Gudenschwager</u>, 191 Wis. 2d at 439-40. However, the circuit court in this case applied the wrong standard of law which is, by definition, an erroneous exercise of discretion. <u>See</u> <u>State v. Carlson</u>, 2003 WI 40, ¶24, 261 Wis. 2d 97, 661 N.W.2d 51 ("[A]n exercise of discretion based on an erroneous application of the law is an erroneous exercise of discretion."). The circuit court's error was not that it continued to agree with its previously announced merits analysis. The circuit court's error was thinking that referencing to its prior decision was all it needed to say about the likelihood of success on appeal.

scale factor to be balanced against the relevant harms.[9]  Rather than conduct this analysis, the circuit court here treated the likelihood of success on appeal as shorthand for its own prior merits decision.  Applying the test correctly, it should not be uncommon, particularly when faced with a difficult legal question of first impression, to rule against a party but nonetheless stay the ruling.

---

[9] The dissent's fundamental error is failing to appreciate that the likelihood of success is a sliding-scale factor.  The dissent seems to think some unnamed threshold of likely success is necessary.  It finds confusing the majority's recitation of black-letter law that some chance of success is required, yet no particular threshold is needed.  The dissent's bewilderment notwithstanding, this isn't contradictory at all.  It is, and has been, the law.

¶69 REBECCA FRANK DALLET, J. (*dissenting*). As leaders of the legislature, Petitioners have a say in what the law is, but they are, like everyone else, bound by the laws the legislature enacts. Thus, Petitioners are bound by Wis. Stat. § 16.74, which requires that all contractual services "shall be purchased by the joint committee on legislative organization [JCLO] or by the house . . . utilizing the . . . services."[1] The record here demonstrates that Petitioners' contracts with outside counsel were neither entered into nor later ratified by the JCLO or the house using those services, and therefore the contracts are invalid. In ignoring this statutory requirement, the majority wrongly allows Petitioners to exercise purchasing authority they don't have, thereby eliminating a safeguard against the misuse of taxpayer dollars.

¶70 I also disagree with the majority's novel application of the law regarding stays pending appeal. It reduces what has traditionally been a four-factor balancing test to two questions: (1) is the issue being appealed subject to de novo review?; and (2) would the court of appeals or this court likely grant a stay? In doing so, the majority undermines circuit courts' discretion to weigh the equities of each case while providing no guidance for how to implement its unprecedented approach.

---

[1] Legislative service agencies, such as the Legislative Reference Bureau, can also purchase contractual services, but no such agency is involved in this case.

I

¶71 Petitioners raise four possible sources of authority for the legal-services contracts they entered into with outside counsel: the Wisconsin Constitution, Wis. Stat. § 20.765, § 13.124, and § 16.74. Because the majority opinion's conclusion rests entirely on § 16.74, I focus on that statute before touching on the other three sources.

A

¶72 Wisconsin Stat. § 16.74 controls who may purchase "contractual services" and who may sign the contracts for those services. Subsection (1) states that "[a]ll . . . contractual services required within the legislative branch shall be purchased by the joint committee on legislative organization or by the house . . . utilizing the . . . services." This is the sole provision in § 16.74 that authorizes purchases of contractual services within the legislature, and it exhaustively identifies the entities that may do so: the JCLO or the house

using the services (the senate or the assembly).[2] For contractual services that only the senate or the assembly will use, § 16.74(2)(b) provides that those contracts "shall be signed by an individual designated by the organization committee of the house making the purchase." See also id. (adding that "contracts for other legislative branch purchases shall be signed by an individual designated by" the JCLO). Subsection (2)(b) is not an authorization to make purchases; it simply identifies who may sign a contract on the senate's or the assembly's behalf when either house purchases services under subsec. (1), saving every senate or assembly member from having to sign individually.

¶73 I agree with the majority opinion that legal services are "contractual services," as that term is defined broadly in

---

[2] There is at least some surface-level tension between the text of § 16.74(1) and that of § 16.74(3) in that the latter implies that a legislative "officer" may be authorized to purchase contractual services. See § 16.74(3) ("Each legislative and judicial officer who is authorized to make purchases or engage services under this section may prescribe the form of requisitions or contracts for the purchases and engagements."). Nowhere in § 16.74, however, is a legislative officer authorized to do so (a judicial officer——the director of state courts——is authorized to make purchases or engage services under § 16.74(1)). Nevertheless, there is no contradiction between the two subsections as subsec. (3) does not authorize anyone to purchase contractual services; rather, it provides that those who are so authorized may dictate the form of requisitions or contracts for purchases of those services. The only subsection that authorizes anyone to actually purchase contractual services is subsec. (1).

3

§ 16.70(3) to include "all services."[3] And no party argues that these legal services are not "required within the legislative branch." See § 16.74(1). The legal-services contracts are not valid, however, unless they were purchased by the JCLO or the specific house utilizing the services.

¶74 A careful review of the record reveals that they were not. The record contains no action by the JCLO, the senate, or the assembly to purchase these services. A review of the legislature's journals reveals the same. See, e.g., Medlock v. Schmidt, 29 Wis. 2d 114, 121, 138 N.W.2d 248 (1965) (the legislature's records are "properly the subject of judicial notice"). They contain no legislative act from the JCLO, the senate, or the assembly approving the legal-services contracts.[4] Without such evidence, there is no factual basis for the majority opinion's conclusion that these contracts are valid under § 16.74(1). The majority suggests that the senate or

---

[3] The majority opinion's reasoning is correct but inconsistent with the court's holding in James v. Heinrich, 2021 WI 58, 397 Wis. 2d 516, 960 N.W.2d 350. There, despite no textual limitation on the phrase "all measures necessary to prevent, suppress, and control communicable disease," the majority wrongly held that it "cannot be" that "all" such measures means "any" measures. See id., ¶¶21-22. Here, the majority correctly reaches the opposite conclusion, explaining that "all" means "all." See majority op., ¶23; see also James, 397 Wis. 2d 516, ¶70 (Dallet, J., dissenting) (explaining that the court may not read into a statute a "phantom limitation").

[4] Section 16.74 does not specify the mechanics of how the senate or assembly must act in order to purchase contractual services. Regardless of what compliance looks like, however, there is no evidence of any action by either house in this case.

assembly could skirt this statutory requirement by simply adopting an internal rule appointing their respective organization committees to approve contractual-services purchases. But that never happened——and even if it had, our precedent makes clear that internal rules cannot trump explicit statutory restrictions. See White Constr. Co. v. City of Beloit, 178 Wis. 335, 338, 190 N.W. 195 (1922) (explaining that governmental bodies "may enter into a valid contract in the way specified by law and not otherwise").

¶75 To be sure, the senate and the assembly's separate committees on organization purported to approve the contracts, but those committees have no authorization under § 16.74(1) to do so. The majority attempts to sidestep that problem by treating "the organization committee of the house" in § 16.74(2)(b) and "the house" in § 16.74(1) as one and the same. That interpretation is flawed in two ways. First, "the house" and "the organization committee of the house" have different meanings and refer to different things. See State v. Matasek, 2014 WI 27, ¶¶17-21, 353 Wis. 2d 601, 846 N.W.2d 811 (reiterating that when the legislature uses different terms in the same or a closely related statute, we should presume that the terms have different meanings). "The house" refers to either of the two houses that constitute the legislature: the senate or the assembly. See Wis. Const. art. IV. "The organization committee of the house," on the other hand, refers to the senate's or the assembly's organization committee, both of which are defined by rule and are made up of certain members

5

of the senate and assembly leadership, respectively. See Assembly Rule 9(3) (2021); Senate Rule 20(1) (2021). Simply put, the senate organization committee is not the senate; the assembly organization committee is not the assembly.

¶76 Section 16.74 makes the distinction between "the house" and "the organization committee of the house" even clearer by explicitly authorizing each house and each house's organization committee to do different things. Each house is authorized to purchase services under § 16.74(1), while the organization committees of those houses are authorized only to designate a person to sign those contracts under § 16.74(2)(b). An authorization to sign contracts is not the same as an authorization to purchase services. If it were, the first sentence of § 16.74(2)(b) would make no sense: "Contracts for purchases by the senate or assembly shall be signed by an individual designated by the organization committee of the house making the purchase." The text of § 16.74 therefore makes clear that a house's organization committee cannot make or approve purchases for contractual services.

¶77 Second, there is no statutory basis for the majority's assertion that the senate and assembly organization committees were "designated by their respective houses" to contract with outside counsel, or that those committees "vested" Petitioners with the authority to enter into the contracts. See majority op., ¶41. Nowhere does § 16.74(1) authorize either house to designate its respective organization committee to exercise that authority. Therefore, neither house may do so. See Fed. Paving

6

Corp. v. City of Wauwatosa, 231 Wis. 655, 657-59, 286 N.W. 546 (1939); White Constr. Co., 178 Wis. at 338. If the legislature had wanted to permit such designation, it would have done so explicitly——just as it did regarding purchase requests and contract signatories in § 16.74(2). See § 16.74(2)(a) (purchase requisitions "shall be signed by the cochairpersons of the [JCLO] or their designees for the legislature, by an individual designated by either house of the legislature for the house, or by the head of any legislative service agency, or the designee of that individual, for the legislative service agency") (emphases added); § 16.74(2)(b) (same regarding who must sign contracts); see also, e.g., Kimberly-Clark Corp. v. Public Serv. Comm'n, 110 Wis. 2d 455, 463, 329 N.W.2d 143 (1983) (explaining that when one statute contains a provision and a similar statute omits the same provision, the court must not read in the omitted provision). And, contrary to the majority's baseless claim, nothing in the record indicates that either house's organization committee was in fact designated to purchase contractual services. Lastly, because neither the assembly's nor the senate's organization committee has purchasing authority under § 16.74(1), they cannot "vest" their non-existent authority in Petitioners. See Wis. Carry, Inc. v. City of Madison, 2017 WI 19, ¶¶23, 28, 373 Wis. 2d 543, 892 N.W.2d 233 (a government body "cannot delegate what it does not have").

¶78 For similar reasons, the majority's assertion that the "legislature" ratified the contracts also fails. The majority claims that, § 16.74(1) notwithstanding, the contracts are valid

7

because the senate and the assembly's organization committees "adopted the contracts at issue," thereby ratifying them. See majority op., ¶42. But when a government entity enters a contract "without [proper] authority," as Petitioners did here, "the acts relied upon for ratification must be sufficient to have supported a contract originally." See Ellerbe & Co. v. City of Hudson, 1 Wis. 2d 148, 155-58, 83 N.W.2d 700 (1957); Fed. Paving Corp., 231 Wis. at 657 (a government body must ratify a contract "with the formality required by statute to make [the] contract"). That means that only the JCLO or the house utilizing the services could ratify Petitioners' contracts with outside counsel because only those entities are authorized to form the contracts in the first place. And, as explained above, the record contains no action by any necessary body regarding these contracts.

¶79 There is therefore no basis for the majority opinion's conclusion that the contracts are valid under § 16.74.

B

¶80 Petitioners offer three alternative sources of authority for the contracts. The first two——the Wisconsin Constitution and Wis. Stat. § 20.765——say nothing about the issue. Setting aside that both sources speak only to the legislature as a whole and not Petitioners specifically, Petitioners point to no language in the Wisconsin Constitution that grants the legislature inherent authority to contract with whomever it wants; nor do they cite a case that says as much.

8

While the Constitution requires the legislature to redistrict the state's electoral maps every ten years, it says nothing about whether the legislature can hire outside counsel to help it do so. Likewise for § 20.765, which deals only with how the legislature pays its expenses, not with its authority to incur them. It does not follow from the statute's "appropriat[ing] to the legislature . . . a sum sufficient" to carry out its functions, that Petitioners may spend money on anything they want regardless of any other statutory limitations. See § 20.765 (emphasis added).

¶81 The other statute, Wis. Stat. § 13.124 (titled "Legal Representation"), also does not authorize the contracts. Section 13.124 provides that the leader of the appropriate house may, in her "sole discretion," hire outside counsel "in any action in which the assembly [or senate] is a party or in which [its] interests . . . are affected." The statute also leaves it to the houses' leaders' discretion to determine whether a particular action actually affects the house's interests. See § 13.124. What is not left to their discretion, however, is determining whether there is an "action" to begin with. And it is undisputed that as of the date Petitioners contracted with outside counsel, there was no pending action in which the assembly or senate was a party or in which either houses' interests were affected. Therefore, the plain text of § 13.124 precluded Petitioners from entering into the contracts.

¶82 Petitioners counter that the court should read "any action" as including any "imminent" action, pointing to Wis.

9

Stat. § 990.001(3) for support. Section 990.001(3) states that, "when applicable," the present tense of a verb includes the future tense. But even assuming that § 990.001(3) applies to § 13.124, it doesn't help Petitioners. Substituting "will be" for the present-tense verbs "is" and "are" results in the assembly speaker being able to hire outside counsel "in any action in which the assembly ~~is~~ will be a party or in which the interests of the assembly ~~are~~ will be affected." That construction, however, just allows the house leaders to retain outside counsel if they believe their house will eventually become involved in an already pending action. It doesn't change the fact that a currently pending action is still required by the statute's plain text. Since there was none here, § 13.124 provides no authority for the contracts.

¶83 Petitioners' alternatives, therefore, cannot save these contracts from the fact that they were not properly authorized under § 16.74, and the majority errs in concluding otherwise.

## II

¶84 While the majority's statutory analysis is wrong, at least its effects are likely to be limited. The same cannot be said for the majority's discussion about the standard for stays pending appeal. Despite its claim that it is merely "explain[ing]" an earlier unpublished order, majority op., ¶48, the majority unsettles what was a well-established, long-

10

standing test for stays, applying the Gudenschwager factors in a novel and unworkable way.

¶85 As we have explained time and again, appellate courts are required to give a high degree of deference to a circuit court's decision to grant or deny a stay pending appeal, reviewing the decision only for an erroneous exercise of discretion. See, e.g., State v. Gudenschwager, 191 Wis. 2d 431, 439-40, 529 N.W.2d 225 (1995). Accordingly, appellate courts must "search the record for reasons to sustain" the circuit court's decision, not manufacture reasons to reverse it. E.g., State v. Dobbs, 2020 WI 64, ¶48, 392 Wis. 2d 505, 945 N.W.2d 609; Gudenschwager, 191 Wis. 2d at 439-40. So long as the circuit court "demonstrated a rational process[] and reached a decision that a reasonable judge could make," an appellate court must affirm, even if it would have reached a different conclusion. Weber v. White, 2004 WI 63, ¶40, 272 Wis. 2d 121, 681 N.W.2d 137. An appellate court may reverse the circuit court's stay decision only if the circuit court applied the wrong legal standard or reached a conclusion not reasonably supported by the facts. See Gudenschwager, 191 Wis. 2d at 440; State v. Jendusa, 2021 WI 24, ¶16, 396 Wis. 2d 34, 955 N.W.2d 777.

¶86 The correct legal standard for deciding whether to grant a stay pending appeal is a four-factor balancing test that has been used by the federal courts for at least 60 years. See, e.g., Gudenschwager, 191 Wis. 2d at 439-40; Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C.

11

Cir. 1958). We expressly adopted it over 25 years ago in Gudenschwager:

> A stay pending appeal is appropriate where the moving party: (1) makes a strong showing that it is likely to succeed on the merits of the appeal; (2) shows that, unless a stay is granted, it will suffer irreparable injury; (3) shows that no substantial harm will come to other interested parties; and (4) shows that a stay will do no harm to the public interest.

191 Wis. 2d at 440. Although not identical, the test is similar to that for temporary and preliminary injunctions. See, e.g., Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977) (unlike with stays pending appeal, a factor for courts to consider regarding injunctions is whether an injunction is "necessary to preserve the status quo").

¶87 Here, the circuit court clearly applied all four Gudenschwager factors. On the first factor, it concluded that Petitioners had presented "nothing" to suggest "they [we]re likely to succeed on appeal on [the statutory] issues" and that it was "unlikely [its] decision will be reversed on appeal." The court then addressed the second factor, concluding that Petitioners had failed to "meet their burden" of showing that they were "likely to suffer irreparable harm." Finally, the circuit court determined that the "third and fourth factors also weigh against granting a stay" because allowing Petitioners to improperly spend taxpayer money would harm both these plaintiffs and the general public. The court of appeals then affirmed the circuit court——twice. Given that the circuit court weighed each Gudenschwager factor, there is no question that it applied the

12

correct legal standard.[5] So when the majority and the concurrence claim that the circuit court applied the wrong legal standard, what they really mean is that they disagree with the circuit court's conclusion. But that disagreement is an insufficient reason to hold that the circuit court erroneously exercised its discretion. See McCleary v. State, 49 Wis. 2d 263, 281, 181 N.W.2d 512 (1971) ("An appellate court should not supplant the predilections of a trial judge with its own."); Gudenschwager, 191 Wis. 2d at 440.

¶88 Instead of applying the Gudenschwager test as it's been traditionally understood, the majority and the concurrence appear to craft a new approach, seemingly reinterpreting the legal standard for each factor. Making matters worse is their failure to provide the lower courts with any guidance on how to apply those standards.

¶89 The majority and the concurrence stumble right out of the gate, failing to apply the first Gudenschwager factor. Gudenschwager requires the moving party to make a "strong showing that it is likely to succeed on the merits," adding that "more than the mere possibility" of success on appeal is "always required." 191 Wis. 2d at 440-41. Both the majority and the concurrence pay lip service to that standard, yet neither explains how Petitioners met it. The concurrence suggests that

---

[5] The concurrence talks itself in circles on this point. It claims both that the Gudenschwager test is the same as it's always been and that the circuit court, which applied that traditional test, applied the wrong legal standard. Both of those things can't be true at the same time.

13

a stay was warranted in part because likelihood of success is a "sliding-scale factor" and Petitioners had a "nontrivial" and "reasonable" chance of succeeding. See concurrence, ¶¶67-68. Of course, it is black-letter law that in any multi-factor balancing test, all factors exist on a sliding scale in that each must be weighed against the others. See, e.g., Gudenschwager, 191 Wis. 2d at 440. But that still doesn't explain why Petitioners had made a strong showing they were likely to succeed on the merits, or whether "nontrivial" and "reasonable" chances of success are somehow synonymous with "more than a mere possibility of success."

¶90 The majority next errs by falsely equating a "strong showing" of likely success on appeal with the fact that the court of appeals reviews questions of law de novo. It provides no explanation for how the de novo standard of review, on its own, gives the moving party more than a mere possibility of success on appeal. To be sure, de novo review gives an appellant a better chance of winning on appeal than a more deferential standard of review——but it "does not make the merits of a party's arguments any stronger." League of Women Voters v. Evers, No. 2019AP559, unpublished order, at 11 (Wis. Apr. 30, 2019) (Ann Walsh Bradley, J., dissenting). There is therefore no reason to believe that a party who lost on the merits at summary judgment has any more than a mere possibility of winning on appeal under a de novo review.

¶91 The majority is unfazed by that logic, perhaps because its position makes the merits irrelevant. Under the majority's

14

view, when the circuit court interprets statutory language for the first time, it must <u>always</u> grant a stay because it's possible another court may disagree with the circuit court's analysis on appeal. That is, the moving party has somehow made a "strong showing" it will win on appeal <u>because it lost on the merits</u> in the circuit court. That "reasoning" is nonsensical on its face. Plus, the fact that a party lost on a novel statutory-interpretation question is a strong reason for a circuit court to deny a stay: If an appellate court has yet to interpret the statutory language at issue, the circuit court has no reason to think that another court is likely to interpret the statute differently. Even if it does, that does not necessarily mean the moving party will win, because different interpretations do not necessarily lead to different outcomes. The bottom line is that de novo appellate review, on its own, says nothing about whether a party has "more than a mere possibility of success" on appeal——a bar that the majority and the concurrence acknowledge that the moving party must "always" clear. <u>See</u> <u>Gudenschwager</u>, 191 Wis. 2d at 441.

¶92 It is therefore hard to make sense of the majority's claim that had the circuit court considered "how other reasonable jurists on appeal may . . . interpret[] the relevant law" under the de novo standard of review, the circuit court's analysis would have been "different." <u>See</u> majority op., ¶53. The record shows that the circuit court was well aware it was deciding a question of law that would be reviewed de novo, even if it did not explicitly reference that standard of review.

15

Whatever the circuit court was supposed to do differently, the majority and the concurrence do not say, leaving circuit courts to guess at how de novo appellate review should factor into their analyses.

¶93 The majority and the concurrence also fault the circuit court for resting on its summary-judgment analysis in evaluating Petitioners' likelihood of success on the merits, but again fail to say why that's a problem. It will often be the case a party is unlikely to succeed on appeal for the same reasons it did not succeed on summary judgment, particularly in cases that aren't close calls. That is why we have previously concluded that when a circuit court decides a question of law and "believe[s] its decision [i]s in accordance with the law," that reason is good enough in most cases for it to also conclude that the losing party "would not be successful on appeal." See Weber, 272 Wis. 2d 121, ¶36. Conversely, "if the circuit court concludes the issue is a close or complex one, the likelihood of success on appeal will generally be greater." See Scullion v. Wis. Power & Light Co., 2000 WI App 120, ¶19, 237 Wis. 2d 498, 614 N.W.2d 565. There is nothing in this record, though, indicating that the circuit court found the statutory-interpretation issue to be close or complex. And the fact that this court ultimately reached a different conclusion on the merits doesn't mean the circuit court was wrong on that score.

¶94 The upshot is that the majority may be right that the first factor will "rarely if ever" favor the movant. See majority op., ¶52. Most parties who lose at summary judgment

16

will have a difficult time showing that they are likely to win on appeal. But that does not mean that a circuit court will never grant those parties a stay. There are three other factors under the Gudenschwager test, and a stronger showing on those may outweigh the moving party's low likelihood of success on the merits. See Weber, 272 Wis. 2d 121, ¶35 (explaining that the factors are not "prerequisites, but rather interrelated considerations that must be balanced together").

¶95 The majority's discussion of those other factors, however, provides little clarity for how a circuit court should analyze them. The majority's application of the second factor——irreparable injury——lowers the bar for when an injury is considered "irreparable." Traditionally, "irreparable injury" means an injury that, without a stay, will harm the movant in a way that "is not adequately compensable in damages" and for which there is no "adequate remedy at law." See Allen v. Wis. Pub. Serv. Corp., 2005 WI App 40, ¶30, 279 Wis. 2d 488, 694 N.W.2d 420. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against" a claim that an injury is irreparable. Sampson v. Murray, 415 U.S. 61, 90 (1974) (quoted source omitted); see also Brock v. Milwaukee Cnty. Pers. Rev. Bd., No. 97-0234, unpublished op., 1998 WL 261627, at *3 (Wis. Ct. App. May 26, 1998).

¶96 The majority lowers that threshold by conflating an "adequate remedy at law" with Petitioners' preferred remedy. It describes Petitioners' injury as their being unable to retain

17

"counsel of [their] choice" to assist with redistricting, and insists that the injury was irreparable because Petitioners "could not get legal advice 'back' for this critical time in which an injunction was in effect." See majority op., ¶57. The concurrence further muddies the waters by labeling Petitioners' inability to retain counsel of their choice a "substantial harm" and a "real deprivation." See concurrence, ¶67. But neither the majority, the concurrence, nor Petitioners explain why Petitioners' injury, however characterized, was irreparable. None explain why outside counsel could not give Petitioners the same advice once the "risk of litigation materialized" and Petitioners could then hire them under Wis. Stat. § 13.124. See majority op., ¶57. Moreover, as the circuit court pointed out, myriad alternatives were available to Petitioners during that time:

> If the Legislature needs assistance in its redistricting work, it has plenty of options. . . . [I]t has available to it the Legislative Reference Bureau, the Legislative Technology Services Bureau, the Wisconsin Legislative Council, and the Attorney General's Office. Among those various agencies and groups there are plenty of resources available to the Legislature to engage in their redistricting role.

In any event, Petitioners could have avoided any harm altogether by entering into or ratifying the contracts "in the way specified" by § 16.74(1). See White Constr. Co., 178 Wis. at 338. Plain and simple, Petitioners' injury was not irreparable.

18

¶97 On the third factor——potential harm to the non-moving party——the majority proposes an unprecedented per capita calculation for taxpayer harms. The majority claims that potential harm to the plaintiffs was "minimal" because they are only "three individuals out of a state population of 5.8 million," see majority op., ¶¶58-59, implying that even if Petitioners were illegally spending taxpayers' money, the only relevant harm to the plaintiffs were their per capita shares. Not only is there no support in our jurisprudence for such a narrow view of taxpayers' harms, the majority offers no explanation for what number of taxpayers or how high of a per capita share is significant enough to weigh against a stay—— again leaving circuit courts in the dark. Our precedent also undermines the concurrence's implication that so long as government officials' wrongdoing can be measured only in "dollars and cents," there's "not much" of a harm to taxpayers, concurrence, ¶67. See S.D. Realty Co. v. Sewerage Comm'n of City of Milwaukee, 15 Wis. 2d 15, 22, 112 N.W.2d 177 (1961) (explaining the "substantial interest" that every taxpayer has in preventing the "illegal expenditure of public funds"). As for the majority's claim that the circuit court should have considered whether the plaintiffs could pursue "a disgorgement remedy," majority op., ¶59, it is unclear how that would work. Disgorgement requires a party to give up profits obtained illegally, e.g., Country Visions Coop. v. Archer-Daniels-Midland Co., 2020 WI App 32, ¶46, 392 Wis. 2d 672, 946 N.W.2d 169, aff'd on other grounds, 2021 WI 35, 396 Wis. 2d 470, 958 N.W.2d 511,

19

but Petitioners have no profits to give up because they were allegedly spending money illegally. Outside counsel profited, and they are not parties to this case.

¶98 Finally, in addressing the fourth Gudenschwager factor——that the moving party show that a stay will do "no harm" to the public interest, 139 Wis. 2d at 440——the majority and the concurrence again identify no error by the circuit court. Instead, the majority improperly conflates the legislature's interest in obtaining outside legal advice and the public's interest in the legislature obtaining such advice. At a minimum, there are two conflicting public interests at play here——the public's interests in informed legislative decision-making and in preventing Petitioners from unlawfully spending taxpayer funds. The majority makes no attempt to resolve that conflict, instead baldly asserting that the "public is better served" by the legislature retaining outside counsel. See majority op., ¶60. All the majority is saying here is that it would weigh the parties' competing interests differently than the circuit court. The same goes for the concurrence's suggestion that the unauthorized expenditure of taxpayer funds is a "limited" harm to the public and "not nothing." See concurrence, ¶4. But, again, whether there is a different way to weigh the parties' competing interests or whether the court disagrees with how the circuit court weighed them, neither reason is sufficient to reverse the circuit court's stay decision. E.g., McCleary, 49 Wis. 2d at 281. So long as the circuit court "demonstrated a rational process[] and reached a

20

decision that a reasonable judge could make," this court must affirm. <u>See</u> <u>Weber</u>, 272 Wis. 2d 121, ¶40. The record here reveals the circuit court did just that, and neither the majority nor the concurrence says otherwise.

¶99 Before today, our precedent for how circuit courts should decide whether to grant a stay pending appeal was well settled and easily applied. But here the majority reinterprets the legal standard for each of the four <u>Gudenschwager</u> factors, and provides circuit courts with precious little guidance for how to apply them. The result is a guessing game about how to conduct a <u>Gudenschwager</u> analysis. We can and should do better.

¶100 For the foregoing reasons, I dissent.

¶101 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this opinion.